**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA, for the use
and benefit of S&D Land Clearing;
MIKE MITCHELL, d/b/a Malaco,
Plaintiffs-Appellees,

v.

D'ELEGANCE MANAGEMENT LIMITED,
INCORPORATED,
Defendant-Appellant,

No. 98-2758

UNIVERSAL SURETY OF AMERICA,
Defendant-Appellee,

and

ENVIRONMENTAL CORRECTIONS
CORPORATION, a/k/a Waste Control
Services,
Defendant.

UNITED STATES OF AMERICA, for the use
and benefit of S&D Land Clearing;
MIKE MITCHELL, d/b/a Malaco,
Plaintiffs-Appellants,

v.

No. 98-2852

D'ELEGANCE MANAGEMENT LIMITED,
INCORPORATED,
Defendant-Appellee,

and

ENVIRONMENTAL CORRECTIONS
CORPORATION a/k/a Waste Control
Services; UNIVERSAL SURETY OF
AMERICA,
Defendants.

UNITED STATES OF AMERICA, for the use
and benefit of S&D Land Clearing;
MIKE MITCHELL, d/b/a Malaco,
Plaintiffs-Appellees,

v.

D'ELEGANCE MANAGEMENT LIMITED,
INCORPORATED,
Defendant-Appellant,

No. 99-1437

UNIVERSAL SURETY OF AMERICA,
Defendant-Appellee,

and

ENVIRONMENTAL CORRECTIONS
CORPORATION, a/k/a Waste Control
Services,
Defendant.

Appeals from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, District Judge.
(CA-97-49-7-F)

Argued: May 3, 2000

Decided: July 13, 2000

Before WILKINSON, Chief Judge, and WILKINS
and WILLIAMS, Circuit Judges.

_____

2

Affirmed in part and reversed in part by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Stanley Leigh Rodenbough, IV, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Greensboro, North Carolina, for Appellant. Augustus Graham Shirley, II, LEWIS & ROBERTS, Raleigh, North Carolina, for Appellees. **ON BRIEF:** H. Arthur Bolick, II, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Greensboro, North Carolina; Charles D. Meier, MARSHALL, WILLIAMS, GORHAM & BRAWLEY, Wilmington, North Carolina; Adam C. Linkhorst, VEZINA, LAWRENCE & PISCI-TELLI, Ft. Lauderdale, Florida, for Appellant. Daniel K. Bryson, LEWIS & ROBERTS, Raleigh, North Carolina; Clyde H. Jarrett, III, ELLZEY & BROOKS, Raleigh, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

D'Elegance Management Limited, Incorporated (D'Elegance) appeals primarily an order of the district court denying its motion for judgment as a matter of law, see Fed. R. Civ. P. 50, regarding a breach of contract claim brought by Mike Mitchell and S&D Land Clearing (S&D) and denying its motion to set aside an award of attorneys' fees.[1] Mitchell cross-appeals the ruling of the district court that he failed to present sufficient evidence of damages resulting from

_____

[1] This action was brought by the United States for the use and benefit of S&D and Mitchell, but for ease of reference, we will refer to the action as having been prosecuted by Mitchell.

D'Elegance's fraud and accordingly was not entitled to treble damages for the fraud under North Carolina's unfair and deceptive trade practices statutes. <u>See</u> N.C. Gen. Stat.§ 75-1.1 (1999) ("Chapter 75"); N.C. Gen. Stat. § 75-16 (1999). We affirm in part and reverse in part.

I.

This action arises out of the removal of debris in eastern Carolina following Hurricane Fran in September 1996. Waste Control Services (Waste Control) was the prime contractor with the United States Army Corps of Engineers (the Corps) by virtue of a written contract covering eight counties in North Carolina, including New Hanover County and neighboring Pender County. Waste Control subcontracted with D'Elegance for the removal of construction and demolition debris ("C&D debris")[2] from New Hanover and Pender Counties for $11.00 per cubic yard. Under the subcontract, D'Elegance agreed to remove at least 5,000 cubic yards of such debris per day.

Mitchell then entered into negotiations with D'Elegance regarding a possible subcontract. D'Elegance represented to Mitchell that it had contracted to remove not only all of the C&D debris in New Hanover County, but also all of the vegetative debris. Removing vegetative debris is quicker, and hence more profitable, work. [3] D'Elegance and Mitchell entered into a written contract pursuant to which Mitchell agreed to perform D'Elegance's debris-removal work in New Hanover County at a price of $6.75 per cubic yard. A trucking company had agreed to provide Mitchell with hauling service for $2.10 per cubic yard. And, based on Mitchell's 19 to 20 years of experience in the field of debris removal, he testified that he knew that his loading costs would be no more than $1.00, and his other costs no more than 25 cents, per cubic yard. Mitchell further testified that for C&D work only, the loading costs would have been an additional $1.00 per cubic yard; that he had anticipated that 90 to 95 percent of the debris removed would be vegetative; and that he would not have entered into

_____

[2] C&D debris consists of building and demolition materials.
[3] C&D debris must be sorted by type of material and hauled to different locations.

4

the subcontract had he known that he would not be allowed to remove the vegetative debris.

Mitchell began removing debris pursuant to the contract on October 4, 1996. Realizing that it would take approximately two weeks for his big trucks to mobilize, Mitchell initially hired smaller trucks to haul debris for $4.00 to $4.25 per cubic yard. Mitchell also hired nine crews to load the debris onto the trucks. Having arranged for his truckers, equipment, and labor, Mitchell anticipated no problems meeting D'Elegance's performance quota of 5,000 cubic yards per day. Soon after Mitchell began working, however, it became apparent that D'Elegance was continuing to remove some of the C&D debris with crews not working for Mitchell. Indeed, D'Elegance refused to allow Mitchell to remove much of the C&D debris, including some of the most profitable C&D debris.[4] D'Elegance also forced Mitchell to begin working in one small area, Wrightsville Beach, which further limited his productivity. In fact, confined to Wrightsville Beach, Mitchell was not able to use all of his crews.

On approximately the fifth day of operation, D'Elegance allowed Mitchell to move his crews out of Wrightsville Beach and begin work in the rest of the county. On that same day, however, the Corps informed Mitchell that vegetative debris removal was outside the scope of his contract. Nonetheless, Mitchell continued to remove C&D debris from the county, concerned that if he abandoned the project he would be subject to liability for breach of contract and would harm his subcontractors financially. Almost immediately after Mitchell learned that he could not remove vegetative debris, a trucking strike began, further curtailing his productivity. Mitchell was also hampered by the fact that D'Elegance was paying its truckers more than Mitchell could afford to pay and was actively attempting to hire away Mitchell's truckers to work directly for D'Elegance. In soliciting the truckers, D'Elegance was informing them that Mitchell did not have a contract and was not going to be paid.

When it became known that Mitchell would not be allowed to load and haul vegetative debris, most of his crews quit working for him.

_____

[4] For example, Mitchell was not allowed to remove C&D debris that had already been stockpiled.

5

Further, Mitchell informed the trucking company that had agreed to supply him with large trucks that he could no longer use them. Mitchell nevertheless continued to load and haul C&D debris until October 29, 1996, when Waste Control informed him that he needed to cease work on the project since he was not going to be paid by D'Elegance. Mitchell removed a total of 29,358 cubic yards of debris while on the project, far short of the amount necessary to meet D'Elegance's quota. Had he been allowed to remove all of the C&D debris remaining in the county when he entered into the contract, he would have removed an additional 166,559 cubic yards. Although D'Elegance paid $55,344 to Mitchell and $80,629.33 directly to Mitchell's subcontractors, it owed Mitchell a balance of $62,232.54 for the debris he had removed. Mitchell was left deeply indebted to his subcontractors.

On November 4, 1996, D'Elegance agreed to pay Mitchell the money due him under the contract conditioned on Mitchell's execution of a backdated contract with terms materially different from the original contract. When Mitchell refused to sign the new contract, D'Elegance refused to make further payments. Without those payments, Mitchell was more than $100,000 in debt to his subcontractors, primarily S&D, to which Mitchell had assigned a portion of his claim against D'Elegance.

Mitchell subsequently brought this action against Waste Control, D'Elegance, and Waste Control's surety. Mitchell asserted, inter alia, causes of action against D'Elegance for breach of contract, based on D'Elegance's refusal to allow Mitchell to remove all of the C&D debris from New Hanover County and to pay Mitchell in full for the debris he did remove; common law fraud, based on D'Elegance's inducement of Mitchell into entering the agreement with D'Elegance by deceiving him into believing that he would have the right to remove the vegetative debris in New Hanover County; and for Chapter 75 violations, based on D'Elegance's deceiving Mitchell into believing he would have the right to remove all of the vegetative debris in New Hanover County, on D'Elegance's attempts to hire away Mitchell's truckers, and on D'Elegance's attempt to have Mitchell execute a back-dated contract as a precondition of payment for work Mitchell had already completed.[5] D'Elegance counter-

_____

[5] S&D asserted a cause of action against Waste Control and Waste Control's surety pursuant to the Miller Act. See 40 U.S.C.A. §§ 270a-

claimed against Mitchell for breach of contract, asserting that Mitchell had failed to meet the 5,000-cubic-yards per-day quota and had failed to pay his subcontractors in a timely fashion. D'Elegance refused to seriously discuss settlement prior to trial despite a statement by Mitchell's counsel that he was fairly certain that Mitchell would settle the suit for $350,000.

At trial, Robert Franklin Coleman testified for Mitchell on the subject of damages. Coleman, who had 18 years of experience with debris removal analysis, was qualified as an expert in the field of debris removal. He testified that based on his experience, Mitchell would have incurred loading and overhead costs of approximately $2.00 per cubic yard in removing the C&D debris that he was prevented from removing, and that based on Mitchell's prior arrangement with a trucking company, his hauling costs would have been $2.10 per cubic yard. Coleman testified that Mitchell's costs for removing the 29,358 cubic yards Mitchell actually removed amounted to $188,827 (including overhead of $58,717) and that he was not aware of any amounts paid directly to Mitchell's subcontractors by D'Elegance.[6] After the close of Mitchell's case, D'Elegance moved

_____

270d (West 1986 & Supp. 2000). This claim serves as the basis for subject matter jurisdiction in this action.

[6] Coleman calculated the total amount to which Mitchell would have been entitled under the contract had it been performed in its entirety by multiplying the number of cubic yards of debris that the contract entitled Mitchell to remove--195,917--by the $6.75-per-cubic-yard agreed-upon price, for a total of $1,322,440. Coleman then calculated the total costs Mitchell would have incurred by adding the costs Mitchell actually incurred in removing the 29,358 cubic yards of debris he did remove--$188,827--to the costs Coleman projected Mitchell would have incurred had he been allowed to remove the remaining 166,559 cubic yards of C&D debris. Based on his experience, Coleman determined that Mitchell would have incurred loading and overhead costs of approximately $2.00 per cubic yard and a hauling cost of $2.10 per cubic yard. The $2.10 was based on the price quotation Mitchell had obtained. Multiplying the $4.10-per-cubic-yard cost by 166,559 cubic yards, Coleman concluded that Mitchell's costs for the C&D debris removal he was prevented from doing would have been $682,892. Adding that figure to the $188,827 in

7

unsuccessfully for judgment as a matter of law on the grounds, <u>inter alia</u>, that Mitchell breached his contract as a matter of law and that he failed to prove lost profits to a reasonable certainty.

Following the trial, the jury answered special interrogatories stating, as relevant here, (1) that D'Elegance breached its contract with Mitchell regarding C&D removal, causing Mitchell to sustain damages in the amount of $400,000; (2) that D'Elegance defrauded Mitchell into believing that the contract would include the removal of vegetative debris, entitling Mitchell to $100,000 in compensatory and $500,000 in punitive damages; (3) that D'Elegance committed all of the conduct alleged to be violative of Chapter 75, and that all of the conduct was "in commerce" or "affecting commerce"; and (4) that Mitchell breached his contract with D'Elegance, entitling D'Elegance to nominal damages in the amount of one dollar.

Mitchell elected to recover damages pursuant to Chapter 75 and moved to treble the entire $500,000 in compensatory damages awarded by the jury. <u>See</u> N.C. Gen. Stat.§ 75-16. D'Elegance renewed its motion for judgment as a matter of law, and in the alternative for a new trial or to amend the judgment. <u>See</u> Fed. R. Civ. P. 59. As is relevant here, D'Elegance contended that Mitchell had failed to present sufficient evidence of damages as the result of D'Elegance's fraud; that Mitchell failed to present sufficient evidence of lost profits from the breach of contract; that the findings by the jury that each party was liable to the other for breach of contract were inconsistent; and that the punitive damages award should be set aside.

The district court set aside the fraud verdict, ruling that Mitchell had failed to prove his lost profits from D'Elegance's fraud to a rea-

_____

costs Coleman stated that Mitchell incurred for the debris he actually removed, Coleman computed that Mitchell's total costs to perform all work under the contract would have been $871,719. Subtracting that figure from the gross amount to which Mitchell would have been entitled for performing all of the work--$1,322,440--and further subtracting the amount Mitchell was actually paid--$55,344--Coleman arrived at a total of $395,377 in damages to which Mitchell was entitled for D'Elegance's breach of the contract.

8

sonable degree of certainty. The court further determined that Mitchell's election to treble his compensatory damages under Chapter 75 mooted D'Elegance's motion to set aside the punitive damages award. The court denied D'Elegance's motions for judgment as a matter of law and for a new trial on the breach of contract claim. Regarding the Chapter 75 claim, the court ruled that the $400,000 in damages awarded by the jury for breach of contract could not be trebled because the jury made no specific findings regarding the nature of the conduct underlying the breach such that the district court could find that conduct unfair or deceptive. The court nevertheless awarded Mitchell $126,231 in attorneys' fees under Chapter 75 on the basis that the fraud constituted a Chapter 75 violation. [7] The court ruled that Mitchell was the prevailing party on the Chapter 75 claim despite the fact that he was awarded no damages under that cause of action, and the court found that D'Elegance's fraud was willful and that it unwarrantedly refused to settle this claim.

D'Elegance appeals the denial of its motion for judgment as a matter of law on Mitchell's breach of contract claim and the award of attorneys' fees. Mitchell cross-appeals the decision to set aside the fraud verdict as well as the failure of the district court to treble all compensatory damages pursuant to N.C. Gen. Stat.§ 75-16. Subsequent to noticing his cross-appeal, Mitchell moved successfully to register the judgment against D'Elegance in the Middle and Southern Districts of Florida. See 28 U.S.C.A. § 1963 (West Supp. 2000). D'Elegance appeals that ruling as well.

II.

D'Elegance first maintains that the district court erred in denying its motion for judgment as a matter of law on Mitchell's breach of contract claim, arguing that any breach by D'Elegance was excused by Mitchell's prior material breach and that Mitchell's evidence of damages was insufficient. We will address these arguments seriatim.

The function of this court is to resolve state law issues as we predict the highest court in the state would resolve them. See Doe v. Doe,

_____

[7] Mitchell also was awarded $8,865.80 in costs, as well as pre- and post-judgment interest on the $400,000 verdict.

9

973 F.2d 237, 240 (4th Cir. 1992). Under North Carolina law, "[t]he general rule governing bilateral contracts requires that if either party to the contract commits a material breach of the contract, the other party should be excused from the obligation to perform further." Coleman v. Shirlen, 281 S.E.2d 431, 434 (N.C. Ct. App. 1981). In the event of an unexcused breach of contract, the measure of damages is the amount that reasonably may be supposed to have been contemplated by the parties when they entered into the agreement or which will compensate the injured party as if the contract had been fulfilled. See Weyerhaeuser Co. v. Goodwin Bldg. Supply Co., 234 S.E.2d 605, 607 (N.C. 1977). In order to recover lost profits as a component of damages, a plaintiff must prove the existence and amount of lost profits to a reasonable certainty. See Olivetti Corp. v. Ames Bus. Sys., Inc., 356 S.E.2d 578, 585 (N.C. 1987). And, in order for lost profits to be proven to a reasonable certainty, cost estimates must be supported by facts in the record. See Tillis v. Calvine Cotton Mills, Inc., 111 S.E.2d 606, 613 (N.C. 1959).

A motion for judgment as a matter of law should be denied if the district court determines that substantial evidence exists upon which a jury could find for the nonmovant, viewing the evidence in the light most favorable to the nonmovant. See Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1383 (4th Cir. 1995). We review the decision of the district court on a motion for judgment as a matter of law de novo. See id.

A.

D'Elegance advances two arguments as to why its breach of the parties' contract was excused as a matter of law. D'Elegance first contends that its breach was excused because Mitchell himself materially breached the contract by failing to meet the 5,000-cubic-yards-per-day quota. We disagree. D'Elegance's president testified that the quota was D'Elegance's and that Mitchell was not required to meet it. Moreover, assuming arguendo that Mitchell had contracted to remove a certain volume of debris, the jury reasonably could have concluded that D'Elegance prevented Mitchell from doing so by allowing him to work only in areas where D'Elegance knew his productivity would be low. See Goldston Bros. v. Newkirk, 64 S.E.2d 424, 427 (N.C. 1951) (explaining that "[a]s a general rule, prevention

10

by one party excuses nonperformance of an antecedent obligation by the adversary party"). Accordingly, substantial evidence supports a conclusion that D'Elegance's breach of contract was not legally excused by any failure on the part of Mitchell to meet the quota.[8]

D'Elegance also contends that its breach was excused by Mitchell's failure to pay his subcontractors in a timely fashion. Again, we disagree. Even assuming that Mitchell was contractually obligated to D'Elegance to pay his subcontractors promptly, a fact finder reasonably could have concluded that by allowing Mitchell to do only the most costly C&D work and failing to pay him in full for the work he actually performed, D'Elegance prevented Mitchell from obtaining the money necessary to pay his subcontractors promptly.[9] See id. Accordingly, substantial evidence supports a conclusion that D'Elegance's breach was not legally excused by Mitchell's failure to timely pay its subcontractors. The district court therefore correctly denied D'Elegance's motion for judgment as a matter of law on the breach of contract claim on the theory that D'Elegance's breaches were excused as a matter of law.

B.

We also conclude that the district court correctly determined that Mitchell's evidence regarding breach of contract damages was sufficient to justify the denial of D'Elegance's motion for judgment as a matter of law on that cause of action.

We note initially that a failure to prove damages is not grounds for a judgment as a matter of law on a breach of contract claim because proof of the other elements of such a claim entitles a plaintiff to at least nominal damages. See Robbins v. C.W. Myers Trading Post,

_____

[8] As we have already noted, D'Elegance argued before the district court that the findings by the jury that each party was liable to the other for breach of contract were inconsistent and therefore warranted a new trial. The district court rejected this argument, however, and D'Elegance has abandoned it on appeal.

[9] Indeed, testimony in the record indicated that D'Elegance's payments to Mitchell were not even sufficient to pay Mitchell's overhead, let alone leave Mitchell with money to pay his subcontractors.

11

<u>Inc.</u>, 111 S.E.2d 884, 886 (N.C. 1960). Moreover, a reasonable jury could have awarded Mitchell compensatory damages on his breach of contract claim on the basis that D'Elegance failed to pay Mitchell in full in compliance with the terms of the parties' contract for the debris Mitchell actually removed.**10** <u>See Weyerhaeuser</u>, 234 S.E.2d at 607. Nevertheless, we address D'Elegance's arguments that Mitchell failed to produce sufficient evidence of lost profits from the work he was prevented from doing.**11**

_____

**10** D'Elegance contends that the district court erred in stating that Mitchell was owed $62,232.54 for work actually performed, arguing that $58,594.30 is the proper amount. This discrepancy is due to D'Elegance's assertion that on October 10 and 11, 1996 Mitchell had no crews to load debris and that D'Elegance loaded the debris for Mitchell before he hauled it away. D'Elegance contends that Mitchell was entitled to only $5.00 per cubic yard for these days rather than the $6.75 that Mitchell was due under the contract for each cubic yard of debris that he loaded and hauled. Because Mitchell presented evidence that he did indeed load and haul the debris on October 10 and 11, however, a reasonable jury could have determined that Mitchell was owed $62,232.54, rather than $58,594.30, for the work he actually completed.

**11** Besides arguing that Mitchell failed to prove lost profits to a reasonable certainty, D'Elegance argues alternatively that it was entitled to judgment as a matter of law on the breach of contract claim because the $400,000 verdict was more than the evidence justified even assuming that Mitchell sufficiently proved lost profits. D'Elegance is incorrect. Whether the verdict was in an amount greater than that justified by the evidence is irrelevant to whether a jury reasonably could have returned a verdict against D'Elegance on the breach of contract cause of action, and hence whether D'Elegance was entitled to judgment as a matter of law. Moreover, the amount of the verdict was fully justified by the evidence. Mitchell removed 29,358 cubic yards of C&D debris. At $6.75 per cubic yard, he was entitled to be paid $198,166.50 for that work, but in fact D'Elegance paid a total of only $135,937.33 to Mitchell and his subcontractors, leaving $62,229.17 as the amount to which Mitchell was entitled from D'Elegance for the work he actually performed. As for the C&D debris that Mitchell was prevented from removing, Coleman opined that Mitchell would have incurred costs of $4.10 per cubic yard. Since he would have been paid $6.75 per cubic yard, he would have realized a profit of $2.65 per cubic yard. Because Mitchell was prevented from removing 166,559 cubic yards of debris, he was deprived of a profit of $441,381.35 for the work he was prevented from doing. Adding that

12

D'Elegance first maintains that Mitchell failed to prove to a reasonable certainty his lost profits on the C&D debris he was prevented from removing because Coleman was not aware of certain facts when he opined that the costs Mitchell would have incurred in removing that debris would have been $4.10 per cubic yard. Specifically, D'Elegance argues that Coleman believed that Mitchell had incurred costs of $188,827 in removing the debris that he was allowed to remove, when in fact that amount did not include $80,593.33 paid directly to Mitchell's subcontractors by D'Elegance. [12] D'Elegance's argument is without merit, however, because Coleman's opinion regarding the amount of costs Mitchell would have incurred in removing the C&D debris he was prevented from removing was not based on the costs Mitchell incurred in performing the work actually completed. Coleman did answer "[y]es" to the question, "[I]f you are wrong about the real costs of Mike Mitchell between October 4 and October 29, that makes all the other numbers you gave the jury invalid and you would have to refigure; wouldn't you?" J.A. 206. However, viewing the testimony in the light most favorable to Mitchell, we conclude that Coleman was stating only that his final damages figure would have to be recalculated, not that every component of his calculation--including, for example, the $2.10-per-cubic-yard trucking-fee figure--would have to be reconsidered.

Citing Catoe v. Helms Construction & Concrete Co., 372 S.E.2d 331 (N.C. Ct. App. 1988), D'Elegance contends that because Coleman testified only to estimates of the costs Mitchell would have incurred in removing the C&D debris that he was prevented from removing, the evidence of lost profits was insufficient. In Catoe, the plaintiff claimed entitlement to 50 percent of the profits for work that

_____

amount to the amount Mitchell was owed for the work he did perform indicates that an award of $503,610.52 was necessary to compensate Mitchell as if the contract had been fully performed. Accordingly, the $400,000 verdict was within the range justified by the evidence.
[12] D'Elegance argues that the amount of costs of which Coleman was unaware was actually $135,937.33, not $80,593.33. However, $135,937.33 represented the total amount that D'Elegance paid Mitchell and Mitchell's subcontractors. Of that amount, $55,344 that was paid to Mitchell was not a cost incurred by him in completing the work.

13

had already been completed, but failed to produce evidence of the total proceeds generated by the work or the total costs incurred in performing the work. See Catoe, 372 S.E.2d at 333-34. Although the plaintiff offered his estimates of both the costs and proceeds of most of the work, the court held that these estimates alone did not provide a sufficient factual basis for an award of lost profits because the plaintiff "merely speculated as to the precise costs incurred and profits earned." Id. at 335.

We do not believe that the North Carolina Supreme Court would view Coleman's cost analysis as mere speculation, however. Coleman testified that Mitchell's costs would have been $2.00 per cubic yard for overhead and loading costs and $2.10 per cubic yard for trucking. Mitchell testified that he had an agreement with a trucking company to haul C&D debris for $2.10 per cubic yard, leaving only the $2.00 figure to be substantiated. Coleman, who was qualified as an expert in the field of debris removal, testified that he had 18 years of experience with analyzing storm debris removal, and that he had performed thousands of debris removal analyses to determine the cost of repairing storm damage. We therefore conclude that Coleman's testimony that $2.00 per cubic yard was a reasonable and realistic rate for overhead and loading was sufficient.[13] Moreover, Coleman's claim that Mitchell could have removed the C&D debris for $2.00 per cubic yard plus hauling costs was supported by a document in evidence in which Waste Control stated that its subcontractor's non-hauling costs were $1.56 per cubic yard. Coleman's projected cost was also very close to the non-hauling cost figure of $2.25 per cubic yard offered by Mitchell based on his 19 to 20 years of experience in the field of debris removal. For all of these reasons, we conclude that Mitchell's evidence of lost profits was sufficient.

_____

[13] D'Elegance contends that Coleman's testimony was undermined by the fact that Mitchell's costs in removing the C&D debris that he actually removed far exceeded the $4.10 per cubic yard that Coleman testified it would have cost Mitchell to perform the remaining work. Although D'Elegance was free to make that argument to the jury, Mitchell's evidence regarding all of the adverse circumstances that he faced in performing that work gives rise to the reasonable inference that his costs for removing the debris he was allowed to remove would not be a good indicator of the costs he would have incurred in performing the more profitable work he was prevented from doing.

14

III.

D'Elegance next maintains that the district court erred in awarding attorneys' fees to Mitchell pursuant to Chapter 75. D'Elegance makes three arguments challenging the fee award, and we will discuss them seriatim.

Chapter 75 prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). The trial court may, in its discretion, award a reasonable attorneys' fee to a plaintiff alleging a Chapter 75 violation if (1) the plaintiff is the prevailing party; (2) the defendant willfully engaged in a deceptive act or practice; and (3) the defendant unwarrantedly refused to fully resolve the matter.[14] See N.C. Gen. Stat. § 75-16.1(1) (1999). "It is well settled that district courts have considerable discretion in awarding attorneys' fees, and we must not overturn an award by the district court unless it is clearly wrong." Colonial Williamsburg Found. v. Kittinger Co., 38 F.3d 133, 138 (4th Cir. 1994) (citation omitted).

D'Elegance first claims that there was no evidence presented to support a finding that it willfully engaged in a deceptive act or practice and that the jury did not make such a finding. D'Elegance does not deny that there was evidence of fraud or that the jury found fraud, but contends that the finding of fraud does not encompass a finding that D'Elegance willfully engaged in the deceptive act. D'Elegance is incorrect. Intent to deceive is indeed an element of fraud.[15] See Helms v. Holland, 478 S.E.2d 513, 516 (N.C. Ct. App. 1996).

_____

[14] Although Mitchell was awarded no compensatory damages on the Chapter 75 claim, D'Elegance does not challenge on appeal the conclusion of the district court that Mitchell was the prevailing party on that claim.

[15] D'Elegance argues that the fact that § 75-16.1(1) provides that in order to recover attorneys' fees a plaintiff must prove that the Chapter 75 violation was willful demonstrates that proof of willfulness is not necessary to establish fraud. D'Elegance's reasoning is flawed. The inclusion of the willfulness requirement in § 75-16.1(1) indicates only that proof of willfulness is not required to prove a Chapter 75 violation. It has no bearing whatsoever on the question of whether proof of a particular violation--here fraud--encompasses proof of willfulness.

15

D'Elegance next asserts that the district court erred in finding that D'Elegance unwarrantedly refused to fully resolve this case. We disagree. The district court determined that D'Elegance refused to seriously discuss settlement, and D'Elegance does not challenge that factual determination. D'Elegance contends that the fact that the $400,000 verdict exceeded Mitchell's best settlement proposal by only $50,000 demonstrates that D'Elegance's refusal to settle this case was not unwarranted. However, even ignoring the more than $130,000 in attorneys' fees and costs awarded to Mitchell, we simply fail to understand how evidence that D'Elegance could have settled this case for less than the amount of the judgment entered against it could vindicate the decision not to attempt a settlement.

With regard to the reasonableness of the amount of fees awarded, D'Elegance argues that the district court erred in failing to make specific findings regarding the twelve factors discussed in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978). [16] We have held that a district court must consider these factors in determining an award of attorneys' fees. See id. at 226. Here, the district court specifically found that the time expended by Mitchell's attorneys was reasonable considering the nature and difficulty of the facts and law involved in this matter, that the hourly rates charged were reasonable in light of counsel's experience and the customary rate for such work in the locality, and that Mitchell's attorneys consistently demonstrated competence during the litigation. D'Elegance made several objections to

_____

[16] The factors include:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Barber, 577 F.2d at 226 n.28.

16

Mitchell's fee application, and the district court thoroughly reviewed Mitchell's documentation and application for fees, and awarded approximately $4,000 less than the amount Mitchell requested. This reduction is strong evidence that the district court carefully considered the fee application and that the award is proper. See Alexander S. v. Boyd, 113 F.3d 1373, 1391 (4th Cir. 1997); Colonial Williamsburg Found., 38 F.3d at 138. We cannot say under the circumstances that the district court abused its discretion in not providing specific detailed findings regarding all of the factors. See Alexander S., 113 F.3d at 1391; Colonial Williamsburg Found., 38 F.3d at 138.

IV.

D'Elegance finally maintains that the district court erred in registering the judgment. We disagree.

Pursuant to 28 U.S.C.A. § 1963, when an appeal is pending, a plaintiff may register a judgment for good cause shown. Good cause exists when the defendant has substantial property in the foreign district and insufficient property in the rendering district to satisfy the judgment. See David D. Siegel, Commentary on 1988 Revision, 28 U.S.C.A. § 1963 (West 1994).

Here, Mitchell stated in his motion to register the judgment that an asset search indicated that D'Elegance had assets available for execution in the Middle and Southern Districts of Florida and noted that Mitchell had been unable to locate any assets owned by D'Elegance in North Carolina. D'Elegance did not dispute that it owned significant assets in Florida and none in North Carolina. D'Elegance argues on appeal, however, that a pending lawsuit it has against Waste Control's surety should be considered an asset in North Carolina and therefore prevent registration of the judgment in Florida. D'Elegance offers no authority for its position, however, and we are aware of none.

D'Elegance also argues that registration of this judgment while Mitchell's cross-appeal is pending violates the rule that one who voluntarily accepts the benefits of a judgment waives any errors in the judgment. See Wohl v. Keene, 476 F.2d 171, 177 (4th Cir. 1973). We do not agree that the mere registration of a judgment can properly be

17

characterized as acceptance of the benefits of that judgment. More-over, Mitchell's actions in seeking to increase the probability that the judgment eventually will be satisfied is in no way inconsistent with his contention on cross-appeal that the amount of the judgment should be greater. See Gadsden v. Fripp, 330 F.2d 545, 548 (4th Cir. 1964) (explaining that an appeal is barred only when the circumstances "in-dicate an intention to finally compromise and settle a disputed claim . . . [and] bring the litigation to a definite conclusion upon a basis acceptable to all parties"). Accordingly, the district court did not err in registering the judgment.

V.

On cross-appeal, Mitchell maintains that the district court erred in holding that his evidence of fraud damages was insufficient to support a compensatory damages award, noting that he produced evidence that D'Elegance's fraud in inducing him to enter the contract caused him to incur costs that he would not have incurred had he not undertaken the New Hanover work. We agree.[17]

Although the district court stated in its order that Mitchell's only damages theory for his fraud claim was for lost profits, we have found nothing in the record to support that conclusion. Mitchell alleged in his amended complaint that he "reasonably relied upon D'Elegance's fraudulent misrepresentations and concealments to[his] detriment by fully mobilizing the Project, by executing the [Mitchell] subcontract, and by performing in good faith [his] obligations under [that] subcon-tract." J.A. 68A16-17. At trial, Mitchell offered evidence of costs of more than $100,000 that he would not have incurred but for D'Elegance's inducing him to enter into the contract. Mitchell subse-quently argued to the jury during closing argument--without objec-tion from D'Elegance--that he was entitled to fraud damages for the costs he had incurred as a result of entering into the contract. The dis-trict court then charged the jury that if Mitchell proved the other ele-ments of fraud, he was entitled to recover "the amount of actual damages caused by the fraudulent conduct of D'Elegance," Trial Tr.,

_____

[17] Because we reverse the decision of the district court setting aside the award on this basis, we do not address Mitchell's argument that the evi-dence of lost profits also was sufficient to support the verdict.

18

Aug. 14, 1998, at 124. Accordingly, substantial evidence supports the conclusion that Mitchell was entitled to compensatory damages in the amount of the costs he incurred as the result of entering into the contract with D'Elegance. We therefore hold that the district court erred in setting aside the $100,000 award on the ground that Mitchell failed to offer proof of entitlement to damages as the result of D'Elegance's fraud.

Mitchell also contends that the award should be trebled pursuant to N.C. Gen. Stat. § 75-16. We agree. In awarding attorneys' fees, the district court specifically found that D'Elegance's fraud constituted a Chapter 75 violation, and D'Elegance has not challenged that ruling on appeal. Accordingly, Mitchell is entitled to an award of $300,000 in the Chapter 75 cause of action. See N.C. Gen. Stat. § 75-16.

VI.

Mitchell argues that the district court also erred in failing to treble the $400,000 in compensatory damages that he was awarded for D'Elegance's breach of contract action pursuant to Chapter 75. See N.C. Gen. Stat. § 75-16. We disagree.

An essential element of a Chapter 75 cause of action is that the defendant's Chapter 75 violation proximately caused the plaintiff's injuries. See Ellis v. Smith-Broadhurst, Inc. , 268 S.E.2d 271, 273-74 (N.C. Ct. App. 1980). Whether the Chapter 75 violation proximately caused the injuries is a factual question for the jury, see id. at 274, but whether the defendant's conduct is unfair or deceptive is a question of law for the court, see Hardy v. Toler, 218 S.E.2d 342, 345-46 (N.C. 1975).

Here, the jury found that D'Elegance breached its contract with Mitchell with regard to C&D removal in New Hanover County, causing Mitchell to sustain $400,000 in damages. However, there was no basis for the district court to determine that D'Elegance's conduct was unfair or deceptive because the jury made no finding regarding what specific conduct by D'Elegance gave rise to the $400,000 damage award.[18] Indeed, one component of Mitchell's breach of contract

_____

[18] Mitchell notes that the jury found that D'Elegance committed specific wrongful conduct: improperly approaching some of Mitchell's

19

claim was that D'Elegance simply failed to pay Mitchell money owed under the parties' contract. Accordingly, there was no basis upon which the district court could determine that the conduct that caused Mitchell's damages violated Chapter 75. See United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir. 1981) (holding that "an ordinary contract breach" is not a Chapter 75 violation). The district court therefore correctly refused to treble the $400,000 award. See Stone v. Paradise Park Homes, Inc., 245 S.E.2d 801, 807 (N.C. Ct. App. 1978) (holding that damages for breach of express and implied warranties would not be trebled when the breach entitling the plaintiff to damages was not a violation of Chapter 75).

VII.

In sum, we affirm the denial of D'Elegance's motion for judgment as a matter of law on Mitchell's breach of contract claim, the denial of Mitchell's request to treble the $400,000 damage award, the award of attorneys' fees, and the registration of the judgment. However, we reverse the decision of the district court to set aside the $100,000 compensatory damage award, and we hold that Mitchell is entitled to have that award trebled as a result of his election to receive Chapter 75 remedies rather than remedies for common law fraud.

AFFIRMED IN PART AND REVERSED IN PART

_____

truckers or subcontractors in an attempt to hire them away from Mitchell, and improperly attempting to coerce Mitchell to execute a back-dated contract which was substantially different from the original contract as a precondition for payment by D'Elegance to Mitchell. The jury made no finding, however, that the $400,000 in damages was necessary to compensate Mitchell for this conduct.

20